**Pages 1 - 54**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

NEVER-SEARCH, INC., Plaintiff,

VS.

APPLE, INC., Defendant.

**NO. 3:24-CV-03945-RFL**

NEVER-SEARCH, INC., Plaintiff,

VS.

GOOGLE, LLC, Defendant.

**NO. 3:24-CV-03733-RFL**

NEVER-SEARCH, INC., Plaintiff,

VS.

MICROSOFT CORPORATION, Defendant.

**NO. 3:24-CV-03950-RFL**

San Francisco, California
Tuesday, December 17, 2024

**TRANSCRIPT OF PROCEEDINGS**

(Appearances on Page 2.)

**APPEARANCES:**

For Plaintiff:

AHMAD, ZAVITSANOS & MENSING, PLLC
1221 McKinney Street, Suite 2500
Houston, TX 77010
**BY: JASON McMANIS**
**SUJEETH RAJAVOLU**
**ABANOUB HENRY**
**ATTORNEYS AT LAW**

MZF LAW FIRM, PLLC
11811 San Vicente Blvd
Los Angeles, CA 90049
**BY: MATEO Z. FOWLER, ATTORNEY AT LAW**

For Defendants:

O'MELVENY & MYERS, LLP
2 Embarcadero Center, 28th Floor
San Francisco, CA 94111
**BY: DAVID ALMELING, ATTORNEY AT LAW**

WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
60 State Street
Boston, MA 02109
**BY: ANDREW J. DANFORD, ATTORNEY AT LAW**

WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
2100 Pennsylvania Avenue, Northwest
Washington, DC 20037
**BY: LI-TSUNG ALYSSA CHEN, ATTORNEY AT LAW**

WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
**BY: MARK DANIEL SELWYN, ATTORNEY AT LAW**

PERKINS COIE
505 Howard Street, Suite 1000
San Francisco, CA 94105
**BY: SARAH PIEPMEIER, ATTORNEY AT LAW**

PERKINS COIE
3150 Porter Drive
Palo Alto, CA 94304
**BY: SARA E. FOWLER, ATTORNEY AT LAW**

**Tuesday - December 17, 2024** **10:03 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** Okay. Calling civil cases 24-3733, Never-Search, Inc. versus Google, LLC; 24-3945, Never-Search, Inc. versus Apple, Inc.; and 24-3950, Never-Search, Inc., versus Microsoft. Counsel, please come to the podium and state your appearances for the record beginning with the plaintiff, and then we'll go Google, Apple, Microsoft.

**MR. McMANIS:** Good morning, Your Honor. Jason McManis on behalf of the plaintiff, Never-Search. And just with the Court's permission, depending on the arguments that come up and the order they come up in today, also from my firm, Mr. Sujeeth Rajavolu will be doing some argument, and Mr. Henry will be handling some of the argument, two of our younger lawyers.

**THE COURT:** Great.

**MR. FOWLER:** Mateo Fowler for the plaintiff.

**MR. ALMELING:** Good morning, Your Honor. David Almeling for Google.

**MR. SELWYN:** Good morning, Your Honor. For Apple, Mark Selwyn, and with me today is Andrew Danford, Alyssa Chen and from Apple, Aaron Huang. And Mr. Danford will be making argument on behalf of Apple today.

**MS. PIEPMEIER:** Good morning, Your Honor. Sarah

Piepmeier from Perkins Coie on behalf of Microsoft. With me is my colleague, Sara Fowler, also from Perkins, and our client, Mr. Nicholas Kim, senior corporate counsel for Microsoft.

Thank you.

**THE COURT:** Good morning to all of you.

I put out a notice of questions last week to give you a sense of some of the questions that I have in mind. So what I'd like to do is just march through the notice of questions. I could hear first on each question from plaintiff, and then each of the defendants can have an opportunity to let the Court know your response. Obviously I ask that the defendants not be repetitive, because many of the same arguments will apply across all the defendants. And hopefully you have reached some sort of consensus as to who's going to take the lead on which question, but it's fine with me since we're doing this as a consolidated hearing, if one person takes the lead, and if each of you want to come up and add something, you may do so. Just try to be conscious of time. And then at the end, I'll have a period where each of you can let me know anything else you want me to know that wasn't in your papers and that we haven't otherwise covered in the argument. And for that I'll give plaintiff the opportunity, and then the defendants, and then I'll give plaintiffs the last word.

So let's start with question number 1. So will plaintiff come up to the podium for question number 1, please.

I'll just read it so we're all on the same page: Never-Search argues that the claims of the '519 patent pass *Alice* Step One because they require a concurrent display -- that should actually say of -- a concurrent display of qualitative information from multiple points of interest. How does that disclose a technological solution when the claims do not specify how the information is to be displayed concurrently, but instead simply describe the result.

Will you state who's speaking also for the court reporter? I think that will be easier. Would you like the ELMO on?

**MR. RAJAVOLU:** Your Honor, Sujeeth Rajavolu for Never-Search.

The '519 patent claims actually do specify how the information is to be displayed concurrently. As you can see from the lower table, Claim 1 recites: Providing an information box comprising the qualitative information. It further specifies: Having controls that control the level of information within the information box. It also requires creating multiple datasets in such a way that the qualitative information is updated based on the dataset selected.

Also, Claim 15, it specifies having an overlay balloon to display the qualitative information.

Claim 2 further specifies the steps on how the display is updated with respect to user inputs.

**THE COURT:** Do you have a different page on the ELMO

that you want me to be looking at for Claim 2?

**MR. RAJAVOLU:** No, Your Honor.

Claim 4, it further recites the steps of how the display is updated by categorizing the points of interest.

Your Honor, these are concrete actions that have been found to achieve -- that have been identified as how the result is achieved. And courts have found similar actions, similar claims as describing how the result is achieved. For example, in *Core Wireless* the claim recites: Having an application summary that lists each of the data which is selectable on the application. And the courts have said these claims are directed to a particular manner of summarizing and presenting information in electronic devices.

In *Hypermedia*, the claims recite: Having a map area of plurality of icons available for selection to access respective video elements, and the Court said first the prior art, which was described in the specification, lacked an efficient web search program, and these asserted claims recite a specific technological advance, a new web program that includes a new and improved user interface.

Your Honor, that is exactly what the (indiscernible) claims are doing. It is disclosing -- these are reciting an improved user interface.

As you can see from the top table, the '519 patent has -- recites on-screen controls for efficient display of the

information. It provides selecting and determining the locations of --

(Reporter clarification.)

**MR. RAJAVOLU:** Selecting and determining locations of multiple points of interest at the time. The prior art lacked that. The prior art had a list of search results that were (indiscernible), and a user was able to select one of those search result at the time to see that particular search result. Over here, the improved user face has all of those, not in the list form, but on the map, and a user can view all of the qualitative information at the time on the map.

**THE COURT:** This kind of reminds me of the *Interval Licensing* case where there was a claim that there's an -- this is really in Step Two, an inventive concept, because there's an interface that lets you display information in a different way. And essentially the Court is saying, the Federal Circuit is saying in that case that you can use names for that function. Like you can call it an information box, you can call it an overlay balloon, you can call it a dataset, but ultimately what you're doing is just describing the function of displaying information in a different way and it's not a technological solution to a technological problem.

How do you see that case as different on the point that you're making?

**MR. RAJAVOLU:** Your Honor, it is different because

over here we are actually having a concurrent display, which is more similar to the *DDR Holdings*.

In the cases that you have said, the result is actually -- like basically there was an abstract idea, and the result was achieved using particular functions. Whereas over here there is a improvement to the particular map programs existing at that time. The map programs at that time did not provide this qualitative information on the map display.

**THE COURT:** I think *DDR Holdings*, though, is different in the sense that that was the case where somebody's going to a website and they're being directed to another kind of store within a store, but the technological innovation was to be able to make it feel like you were still in the original website. And so there were all these technological challenges to maintaining the look and feel of the first website while in the second website, and then the patent walks through how to actually do that. It doesn't just say, the concept of having a website that looks and feels like the first website, or having a second website that looks and feels like the first website.

So help me understand why this case is closer to *DDR Holdings* than it is to *Interval Licensing*.

**MR. RAJAVOLU:** Okay. In *DDR*, what the Court found as the specific improvement was a user using a particular web page, if he clicks on that particular link he goes to a different web page. And it is conventional that way, like to

go to a different page. What *DDR* patent was, the claim says it's a composite web page to the visitor with a look and feel based on the look and feel in the data store.

So what it does is it provides kind of like a hybrid interface where you don't lose your customers and have those customers view the information on the web page itself. It is similar, the '519, because that is exactly what a user has to do. If there is no qualitative information displayed on the map, a user has to go out to a different website to find that information, or call up that business, or do something going out of that platform. Whereas this claim lets the user stay in the platform particularly while driving, while navigation. The user can stay in that particular platform and obtain that information, which is what the *DDR* is about.

**THE COURT:** But doesn't there need to be a level of specificity in how you describe what it is that needs to be changed in the user interface beyond just kind of the concept of having qualitative information about different points of interest on the map?

**MR. RAJAVOLU:** Yes, Your Honor. And that's what I think the lower table that I said, the language that is used on how this is performed is similar to the ones that have been approved, have been held as nonabstract.

Second thing, the specification further recites how this is achieved. If you can see, there is ... sorry.

So as I was saying, the specification further describes the control buttons. There are like multiple figures and the specification describing how on the screen that is displayed, having a plus/minus controls on adding or reducing the information level; selecting a user favorite points of interest. So that like you will find the information only for the ones that your favorite, say, restaurants.

**THE COURT:** Can I rely on those elements of the specification if they're not incorporated into the claim limitations, though? Because I don't see the specification as necessarily saying this is the only way to do it. It's just like an example of how to do it. So can I really rely on that to find this to be nonabstract or to find the inventive concept? Don't I have to focus on the claim language itself?

**MR. RAJAVOLU:** Uh, yes, Your Honor, the claims have to be read in light of the specification. And although the focus is on the claims, when you look at the specification, it would further throw light on how it is achieved. And there are multiple Federal Circuit cases saying we have emphasized the specifications disclosures regarding the improvements in computer functionality as one of the analyses that they are doing, which is mentioned in the specification.

**THE COURT:** Thank you.

Let me just give defendants an opportunity to respond. Whoever drew the short straw and has to be up on this one can

come up first, and then you can each have an opportunity.

**MR. DANFORD:** Thank you, Your Honor.

**THE COURT:** Thank you.

**MR. DANFORD:** Good morning, Your Honor. Andrew Danford. And I'll take the lead on behalf of all of the defendants in responding to Your Honor's first question.

We prepared some demonstratives that we exchanged earlier. With the Court's permission, could I hand those up?

**THE COURT:** Okay. And I just want everyone to know that the demonstratives are not being made part of the record. So if you have something that you're citing, just make sure that you're saying it for the court reporter, too.

**MR. DANFORD:** Thank you, Your Honor.

I'd start with what we put on Slide 3, which is just the language of Claim 1. We went over this extensively in our briefing, but I think what's remarkable about this claim is that it doesn't specify anything about the computer technology that's necessary to practice this invention. It just requires that the invention be computer implemented. That's precisely what *Alice* said does not pass muster in terms of the patent eligibility analysis, either at Claim -- at Step One or Step Two, and this claim couldn't be more generic in terms of the technology that it requires.

You know, there were a number of cases that were discussed by plaintiff. This case is not analogous to *DDR*, it's not

analogous to *Core Wireless*, it's not analogous to *Hypermedia*. In each of those cases, the claims actually required a specific and technological way to achieve the result. In *Core Wireless*, for example, you know, information was summarized into a screen that was shown even without launching an application, so it changed the way that the computer works. That's not what's described or required by any of these claims.

*DDR* worked similarly. It changed the way the computer worked by describing a specific way to create a hybrid website. And the Court, the Federal Circuit went out of its way to note that that did not claim every way of potentially creating a hybrid website, but only the specific technological way that was recited in the claims. The claims here have nothing to anchor them to any particular technology like in that case.

And similarly, *Hypermedia* also had a specific technological way. There were forward-linked websites that had a particular way that changed the way that the information was associated with each other. Nothing like that, again, here is recited or claimed in any of these claims.

I want to respond to the point about on-screen controls. I think there was some discussion by plaintiff about the plus or the minus that show more or less information. The patent specification actually gives you a little bit more detail about what that is. They're shown in the figures as just sort of the standard plus and minus boxes that you might get using any

Windows application. But the text in the patent specification at Column 5, Lines 55 through 62, actually spells this out and says, well, here is how -- here are the controls to show more information or less information. It literally is just the minus sign to minimize, the plus size to maximize and show more, or an "X" to close the box. That's not anything technological, and the patent doesn't purport to describe any new way to enable a feature that wasn't possible before in that regard.

And again, I think Your Honor hit the issue squarely on the nose in directing the discussion toward *Interval Licensing*. That, again, was a patent where there was a user interface that was claimed, but it was claimed at such a generic and high-level manner that it didn't specify a patent-eligible nonabstract idea. The claims here suffer from a similar defect. The same is true for *Trading Technologies*. Again, another user interface case where the purported improvement was in making the user experience better, but the Federal Circuit said without any corresponding improvement in technology, that's not a patent-eligible nonabstract idea.

And again, I think if you look at the *Zillow* case, as well, *Zillow* again involved one of these claims to mapping technologies. Allowed users to select particular information to display. There were on-screen controls to do that, to actually select a particular area on the map. None of that

made for a patent-eligible invention, and these claims suffer from the same defects.

**THE COURT:** Thank you.

Let me move to question number 2, then. Plaintiff can come on back up to the podium. I'll just read the question while you're coming up here. Question 2 is: Never-Search argues that the specification of the '519 patent, which discloses certain folder structures for displaying user-selected subsets of points of interest, supplies the required inventive concept to pass *Alice* Step Two. But can the Court rely on those embodiments in its Step Two analysis if the claim language does not limit the invention to those embodiments? And also, how does Never-Search distinguish the Step Two analysis in *Intellectual Ventures*.

**MR. McMANIS:** Your Honor, Jason McManis for the plaintiff.

So I think the answer to the first question there is pretty straightforward. The claims certainly have to be read in light of the specification, but the claims must capture the improvements that are described in the specification. And I think there are a number of Federal Circuit cases that say that, and I doubt there's much dispute between the parties on that issue.

I think the question becomes, under *Berkheimer*, for example, when those improvements are captured in the claims, it

becomes a factual dispute as to whether or not the invention describes well-understood, routine and conventional activities. And that's important, because here we are at the pleading stage, and other Federal Circuit precedent, *Cellspin versus Fitbit*, says that if you have a fact dispute about whether or not something's inventive, that can't be resolved at this stage of the case.

**THE COURT:** Well, you say that the specification -- of course the claim language has to be interpreted in light of the specification, I'm sure everybody agrees on that. But doesn't the limitation need to be part of the specification? So, in other words, if your claim language is broad and unlimited, just claimed and functional terms, can you cure the abstractness of that concept by giving a really specific example as an embodiment?

**MR. McMANIS:** I think in Your Honor's example there, if that was all there were, I think the answer would be probably not. But it is, I think, important to note that the language used in those cases is that the claims capture, not are limited to, the invention. And I think there is a distinction there.

Now, the reason I say if we were limited to Your Honor's example is -- and I think this probably falls back on some of the representativeness issues that have been briefed and Mr. Henry may talk about later if we have time, but we even

heard there in the argument from defendants the focus on this claim, this claim. Well, there are dependent claims that do take steps further, and some examples of that here in the '519, you know, would even be Claim 2, which has additional method steps that recite a particular order of steps that must occur. Same thing with Claim 4, a particular order of steps, talking about receiving requests and in response to requests, you know, addressing some of the other -- so there is a narrowing and further description of this information as you go throughout the claims.

And again, I think that's important when we are talking about a motion to dismiss at the pleading stage based on a single independent claim from the patent to then be applied not in the case of the '519, but in other patents, to multiple patents with multiple different claims, which kind of -- and that kind of claim-specific point I think brings me to Your Honor's second question about *Intellectual Ventures*. Which, actually, there was agreed representativeness in *Intellectual Ventures*, so that's a little bit different than what we have here.

But the claim that was analyzed -- and this is on page 1339 of the *Intellectual Ventures versus Capital One* opinion -- it does just recite generic components that perform certain functions. It does not put those in any particular order. It does not describe what those components are. I

mean, it is -- and I think ultimately the Court's analysis with it was there was nothing in the claims indicating what steps were actually being taken to overcome the technical problem.

And I think that is a little bit different than what we have in the '519, and the '519 -- like I said, Claims 2 and 4 as examples prescribe a particular order in which steps must occur beyond what Claim 1 presents. Claim 7 describes a particular way of organizing the information that narrows and further describes on top of Claim 4, the ordered steps. And then Claim 15 I believe was referenced earlier with respect to the overlay balloon.

So I think there are particular methods described here that take this case maybe outside of what was being discussed in *Intellectual Ventures*. And frankly, I pulled up the, the I think it was Intellectual Licensing, or *Interval Licensing*, I'm sorry. I pulled that up. The claim there is actually very similar to the claim in *Intellectual Ventures*. It's component 4 this, component 4 that, or similar-type language.

I think if you look at the claims of the '519, they're very similar to what were found to pass actually both Step One and Step Two in the *Hypermedia* case here in the Northern District in 2018, where those claims captured the invention of making information available more efficiently to a user, and the specification in *Hypermedia* described the problems that users had with accessing that information. I think the

specification here in the '519, as well as the other patents, describes those as being the problems that it was intended to overcome, that the claims were intended to overcome.

And so those types of problems -- or, I'm sorry, the solution to those types of problems, that's what's being described in the claims. And it is -- it does go beyond, particularly as we look at additional claims in the patent, it does go beyond the level of genericness that we see in *Intellectual Ventures* or *Interval Licensing*, and it does present at least a question as to whether or not those were, in fact, inventive concepts versus well understood and routine.

**THE COURT:** Just looking at Claim 2 of the '519 patent which I've got up on the screen here for myself, it looks like the order of steps that you're talking about is really receiving a user input, and then it -- the user indicates a level of information that they want, and then in response to the user input it's displaying the information in a certain way. Is there something in the specification that explains how this is a technological solution to a technological problem? Because just reading the claim language without anything in the specification that shows this is really a technological solution to a technological problem, it looks like the user picking whatever information they want to display, it looks like the abstract concept of a user selecting what information they want to see on the map.

**MR. McMANIS:** So I think the answer to that is the specification describes this problem as being one that is specific to digital mapping programs at the time in 2004. And so it is rooted in a technological problem because that's where it starts. And that might sound a little bit circular.

**THE COURT:** But isn't that a problem with paper maps, too? The paper map doesn't have the information about the hours for different golf courses and stuff that would be useful, and then you have to go to the back of the guidebook and cross reference, you know, golf course number 19 and then look in the back of the guidebook. It seems like a similar problem.

**MR. McMANIS:** I think it's a little bit different in that the digital map programs were attempting to provide some of this information, and they were doing so inefficiently or doing so in a way that was not as user friendly. And so coming up with a solution to solve that problem that was specific to digital maps -- and again, this will be a recurring theme as we come up. There's some other problems that are specific to digital maps that arguably exist in paper maps but weren't really the types of problems you would try to solve in that scenario.

I mean, we're talking about a program, Microsoft Streets and Trips, that comes out on a CD-ROM. It contains some level of information, and it's intended for users to be able to click

through that and access what they need, et cetera. Well, there were gaps in what that provided to a user compared to what the Never-Search invention to make more of that information available in a user-friendly way. And doing that, presenting that information more efficiently within that digital construct, the digital maps, is exactly the type of thing that the Court looked at in *Hypermedia*, which is --

**THE COURT:** I'm not saying the idea isn't necessarily itself an advance and inventive, it's just the question of whether it renders the invention nonabstract or transforms it into something nonabstract. It's hard for me to see how having a two-step process, Step One the user selects what they want to see, and Step Two we show it to them, how is that nonabstract? That's what I'm struggling with, to help me understand why your view is that that transforms it into something nonabstract.

**MR. McMANIS:** Certainly.

And so I think if we -- I'll use another example, Claim 9, which actually has a longer sequence of steps. And I think first, the first answer is I don't think the defendants have really presented evidence or argument on these other claims, because they contain this series of requests back and forth that do not exist in Claim 1, which is the only claim that was briefed. So that's, I think, a number one problem or sort of a threshold problem.

And number two, when we're at the pleading stage, when we

have these types of solutions that are overcoming an actual problem that's been described in the specification, there I don't think -- well, I won't speak for the other side. I think those inventions are captured in these claims. And as we go through the dependent claims that have these series of requests and responses and presenting additional information in particular ways, I think that gets us to the fact question at the pleading stage as to whether or not this was inventive. Because under *Cellspin*, if you have it in the claims and it's captured, then there's at least a factual dispute at the pleading stage.

And so I think that's the answer to Your Honor's question.

**THE COURT:** Thank you.

Let me give defendants an opportunity to respond.

**MR. DANFORD:** Good morning. Andrew Danford again.

Let me just start quickly with the question of what can be considered. It does have to be in the claims. I think there is agreement between the parties on that.

With respect to the question about factual disputes, I think it's important to remember what the actual analysis is at Step Two. The abstract idea at Step One cannot supply the inventive concept at Step Two. And so when you look at these claims they just recite the abstract concept, and there's -- if you strip away the abstract concept there's nothing more to them. There's not a particular arrangement of computer

technology that allows you to do something that you couldn't do before. It is just describing the computer doing something, and that's this results-oriented claiming that the Federal Circuit has said is not sufficient to supply an inventive consent at Step Two. That's exactly the issue that the Federal Circuit addressed in the *Capital One* case, it shows up in the *Zillow* case, as well, and it's repeated time and time again.

I do want to also speak briefly to some of the additional claims that Never-Search addressed in its argument. Your Honor looked at Claim 2 with counsel. I think that Claim 2 just recites receiving an input and then displaying the result of the input. That is not inventive. That describes the necessary sequence of events. If you look at the cases like *Zillow*, they're framed in the exact same way. You make a selection, and then you display the result based upon that selection.

Same issue with Claim 4. Claim 4, you know, to the extent you're grouping things into different categories, grouping information does not supply an inventive concept either. That's the *TLI* case that's cited in the briefing. If you just categorize stuff based on its content, that's not an inventive concept.

That's the same issue with the folders from Claim 7. The *Broadband ITV* case recently held that the hierarchical ordering on a user interface -- this time it was in the context of a

cable TV user interface. But again, hierarchical ordering of folders is just a way to organize information. It's one of these basic concepts that is not patent eligible, and so that can't supply an inventive concept.

And then with respect to Claim 9, you know, this Claim 9 does actually tie into what the Court addressed in question 2, because it does talk about the favorites list. But the favorites list is not an inventive concept that can save that claim either. It's just identifying informations by content or source. It's the analog of, say, having your travel guide circling the places that you actually want to visit, and then when you look back at it you can see the ones I want to visit, because I've circled them. You're just doing the same thing in a digital realm.

You know, there was a lot of discussion about, you know, what the patent specification says or doesn't say. But if you read the patent specification, it doesn't say that there is some problem with computers, that we couldn't somehow display multiple things or we couldn't filter the information to show the favorites. All they're saying is, do it. And when you have these computer claims that just say, do it using a computer, that's not an inventive concept. That is the very definition under *Alice* of something that doesn't supply an inventive concept under Step Two.

**THE COURT:** Okay. Thank you.

Let's move to question 3. Question three is: Never-Search argues that the claims of the '318 patent are nonabstract because they identify a manager of a point of interest, connect to that manager electronically, and store updates from the manager in the database. How is that different from automating the paper-and-pencil process of calling managers to update a paper guidebook or an atlas?

**MR. RAJAVOLU:** Sujeeth Rajavolu for Never-Search.

Your Honor, it is different from a paper-and-pen analogy here, because here calling a manager and updating an atlas would not automatically, like, make that change across all the users if they are using a paper atlas, one.

Two, there is no way to call manager if that particular point of interest is not even appearing on the atlas. That is something what this invention is trying to achieve, because as stated in the specification, between 15 to 20 percent of the addresses are not even there in the conventional map programs that were accused, and more than like 80,000 golf courses were not appearing in these programs. So if there is no program appearing on the atlas, there is no way for you to call up a manager.

**THE COURT:** But that kinda reminds me of the *Zillow* case in a sense, that, you know, it -- the process of doing it on a computer often does let you plow through a volume of information that you wouldn't be able to do with paper and pen.

But that doesn't~-- the Federal Circuit has said over and over again that doesn't let you patent doing it on a computer just because it makes it faster, it automates it and lets you do it at a bigger volume than you could before. So how is this case different from that situation?

Do you need the ELMO again?

**MR. RAJAVOLU:** Your Honor, I want to, like, first talk with *Zillow*, talk about *Zillow* case.

The claims that are -- that were at issue in *Zillow*, basically all it had was having a user select up -- like there is a display, and if a user draws an outline within that display, whatever are the points of interest within this particular outline will be appearing now. That's the claim that was focused in *Zillow*. That was one claim. That patent had a different set of layers, each layer having a different color.

Your Honor, that is not the improvement that is focused in this particular invention. As you can see, this is providing manager tools to draw an outline of a structure. For example, there is a Starbucks within a airport terminal. There is -- in fact, the existing map programs, they didn't even had an outline for these structures at that time for an airport terminal or anything. All it was was a pinpoint location there.

This one improved it by letting the manager draw an

outline of the structure and then even point exactly where that location is in the map. And that is instantly available for all the users across to know that where, like the updated information. This is completely different from the patents at issue or the claims at issue in *Zillow*.

**THE COURT:** Is that something you could do on a pen and paper, though? You could have an outline of the mall and have different points of interest within the mall. It's hard for me to understand how it's not a do-it-on-the-computer-type patent. Help me understand your view of that.

**MR. RAJAVOLU:** So I would say two points for that.

First, as I mentioned, there is no way to do updation (phonetic) or drawing of anything if that is not even listed on the atlas. And even if it is updated, it is not instantly -- that is what the digital programs are, not the atlas maps.

**THE COURT:** Wait. Let me just ask you about that point about if it's not even on the atlas.

Can't somebody call in, in the olden times when people used paper guidebooks, you know, if you had a golf course that didn't make it into the paper guidebook, you could call someone up and say, hey, I have a great golf course, you should consider adding it to your guidebook? But how is this different from that process?

**MR. RAJAVOLU:** So I would say, Your Honor, that if any claim, if it taken at that high level of abstraction,

anything could have an analogy there, and courts have actually held that. For example, in *Hypermedia* again, the Court said even if the invention could be performed in the absence of a computer, it is the plaintiff's novel and improved application of that method that makes it patent eligible. Similarly, *Micro* has said that there is no dispute that processes that automate tasks that humans are capable of performing are patent eligible if properly claimed.

So if there is like a high level of abstraction, everything could be found analogous. And this is what our invention is. It is improving this particular technological problem, which, as you can see in the upper table, is geocoding. That is the technological issue faced by the conventional art existing map programs at that time. They were very inaccurate and incomplete because of the way the addresses were mapped. And if you want to update any information, it was very difficult and sometimes impossible to do that.

The '318 patent, what it does is it provides a network-connected database linking the managers and the end users, so that the managers can and also provides the managers with the tools to update those information. And once this information is updated, it is instantly sent across all the users. This is the focus of the invention.

So the paper and print analogy or any analysis has to consider what is the focus of the claimed advances over the

prior art. As you can see on the claims -- in the claims, sorry -- or in the specification, the focus is always on the digital map programs and the problems faced, technological problems faced by those mapping programs, and that is what the patent is directed to.

**THE COURT:** Is that a technological problem, the fact that digital maps used to rely on addresses and didn't distinguish between, you know, six different storefronts within the same physical address, like a mall or something like that? Help me understand why you view that as a technological problem as opposed to a, just a difficulty with mapping things generally that applies equally well in the paper world.

**MR. RAJAVOLU:** It is a technological problem, Your Honor, because of the technology issues in those. The issue is in the technology used in those digital map programs, which is the geocoding. That particular geocoding which converts street addresses onto the locations in the map is the issue for this inaccuracy, for this incompleteness aspect which is inherent in the technology, and that is what we are trying to provide solution to the issues faced by using that technology.

**THE COURT:** I understand your argument. Thank you.

**MR. RAJAVOLU:** Thank you, Your Honor.

**THE COURT:** Let me give defendants an opportunity to respond.

**MS. PIEPMEIER:** Good morning, Your Honor. Sarah

Piepmeier on behalf of Microsoft, and I'll address question 3. I think we've bled a little bit into question 4 here, which is fine, but I'd like to actually directly answer question 3 and then address question 4 separately, unless Your Honor has questions.

So just to orient us, obviously question 3 is about the manager. And we didn't talk a ton about the manager, but I actually think that's a really salient part of the claim when we're looking at the Step One analysis. It doesn't surprise you probably to learn that we don't think the manager saves the claim from abstractness.

Now, let's turn -- I have handed up slides. I don't know if Your Honor has them, but on Slide 15 I put up just Claim 1 of the '318 patent, and I want to just orient us to what that claim does and what the manager does in that claim, because that is Your Honor's question.

So the character of the claim as a whole, which is what we look at in the Step One analysis, is directed to the idea of receiving, updating and providing stored POI, or point of interest, information. Right?

And now this is where Your Honor's question comes in. So how does the manager fit into this? The manager is, as counsel was saying, what allows the updating of an incorrect address. But here's the problem, the manager's a human being. So I don't care how technological the problem is described in the

specification -- and obviously we disagree with that -- the solution that they're providing in the claim is literally have a person, in the olden days it might have been pick up a phone, maybe now it's fill out an entry in a database, but say, I need to correct this, I need to correct this information.

And Never-Search in its brief, for example at page 9, which I've put on Slide 16, makes the point that was just made, which is this is a specific technological problem. But what they actually cite to in their brief to demonstrate that is: A, Claim 1, they cite to Columns 29 to 30 in the specification, which is Claim 1. We just talked about Claim 1. And then they cite to Column 17, starting at line 22 of the specification.

So let's actually look at that. I put that on Slide 17. What the specification teaches us about this manager is precisely that it's a human being, and so you've got a person. This is what they cite to. You have a person in the claims solving this problem. I just fail to see how that takes us out of the realm of an abstract idea.

I mean, just to give you an analogy, I have a very small property up in Forestville, just about 68 miles north of here, and it's off of a lane, because it was carved out of multiple larger properties, and that lane is not on a map. And so when I drive there and use Google Maps, Google Maps tells me I get there way before I do, because it doesn't know about that lane. And I'm sure there is a way for me on Google Maps, as the

quote-unquote manager of that point of interest, if anyone cares about that property other than me, is to, you know, update that and say, no, actually you have to turn here and go here to get to that property.

Well, first of all, it's not a problem I care enough about to actually fix. But second of all, if the solution to that is me filling out a form on Google Maps and solving it, I don't see how that makes it a technological advancement. I am not the technological advancement of the claim.

And so, finally, Your Honor, I just, I think that is the Step One question. But I want to go back to *Interval Licensing*, which Your Honor raised in regards to questions 1 and 2 in the '519 patent, because I actually think that's instructive here, too.

So in *Interval Licensing*, as Your Honor noted, you're talking about the idea of kinda filling a screen. And the Federal Circuit actually looked at the name of the element there was an attention manager. And in *Interval Licensing*, basically what you could do is you could, you know, put something on the screen that was nondisruptive, wallpaper, screen saver, whatever, that wouldn't interrupt the flow of information.

And it would be analogous to one of my colleagues right now walking up here and handing me a note that wouldn't disrupt, hopefully, my presentation. Right? A way to get my

attention without interrupting the flow of information. And the Federal Circuit said, you know, automating that, automating the attention manager doesn't solve the problem. That's not patentable.

So if an automated version of it, to go to Your Honor's question, if an automated version of the manager from *Interval Licensing* does not pass muster, then I fail to see how me, as the manager updating my property in Forestville, could possibly be. The fact is, this is just preempting an entire field of information.

Now, we got to -- counsel mentioned geocoding. That actually isn't something that arose in their Step One analysis. I think that is actually more properly dealt with in the Step Two analysis. So I would like to address that point, but I want to be faithful to Your Honor's question about manager.

**THE COURT:** Fine to address it and respond, and then if they have further response we can do it in question 4.

**MS. PIEPMEIER:** Okay. I feel like we kind of have bled into *IBM* a little bit, and so maybe I can just kind of make that argument now and be superefficient here.

So in *IBM versus Zillow*, which I do think is dispositive of both the Step One and the Step Two question here -- in fact, I haven't seen a case that is closer. Obviously deals with mapping, et cetera, but it is extremely close. The claims there at issue are extremely close here, because you're talking

about mapping, you're talking about, in the '789 patent, drawing a circle and having a list of, you know, elements I think they call it, in the patent occur. In the '389 patent you have a concept of layers that we've just talked about, layers which you could analogize in the '330 patent to datasets. And we'll get to that later, perhaps. But the whole point of that is it didn't involve, it didn't actually involve an improvement to technology. It didn't go, as Your Honor said, beyond the concept of the abstract idea itself. Doesn't matter how inventive it is. If it's not giving you something beyond the abstract idea itself, it can't save you under the Step Two analysis.

But I think what I really wanted to point out about the counsel's points about *IBM versus Zillow* and geocoding is let's give them the benefit of the doubt. As counsel has mentioned, this is arising on a motion to dismiss. We need to construe the facts most favorable to plaintiff. Let's give them the benefit of the doubt. Let's say that geocoding is all over the specification. It's not in the claims. And so I don't really care if they describe in the specification and say, look, this arises because of geocoding.

And again, they mention that in their Step Two analysis, not their Step One, which is why I'm leading into it to respond. But where in the claims is geo coding? If you go back to Claim 1 of the '318 patent, which I've put up on Slide

24, I don't see geocoding anywhere. And the problem is that what they've done is preempt the entire field of updating information using a manager.

If the claim were actually drawn to, look, you've got a problem with geocoding, we're gonna fix that problem with geocoding, for example, you could have drawn this claim in a way that more closely approximated *X1*. And in *X1* you had a situation where you had a couple of different software modules working together to solve a technological problem. And in the Step Two analysis, as an order combination, Judge Koh found that survived the test. But you don't have that here. You don't have anything at all about the problem of geocoding. You certainly don't have anything about the solution. What you've done is preempt the entire field.

*And so I don't think geocoding is relevant at all in either the Step One or Step Two analysis. What we're left with, as Your Honor said, is a do-it-on-the-computer situation. And I would suggest that, you know, this is really a case that could be decided not only based on IBM versus Zillow*, or at least this patent, but on *Trinity*, Federal Circuit case that we cited repeatedly; *Credit Acceptance*. Both of those cases say, look, it's not even just about making it faster, better, whatever. Even if the computer is doing something that you couldn't really do with a human being's mind, right, it's automating something that you couldn't really do, that's not

enough, because it's still the abstract idea. And so I think *Trinity* and *Credit Acceptance* basically deal with that.

Now, I do want to -- since they raised geocoding, I do want to -- because again, I think it's important to look at this from the light most favorable to plaintiff. I do want to note that dependent Claims 5, 12 and 17 use the word "geo coordinates". It's like a, you know, where in this location has a geo coordinate. Well, a geo coordinate is math. Right? First of all, math is an abstract idea, but a geo coordinate is numbers.

And so I just want to point out that, you know, the closest they get to talking about a problem, which is definitely not a solution for geocoding, is simply noting that where in the location can have a geo coordinate. But, I mean, we're standing here right now. That has a geo coordinate. Everything has a geo coordinate. That doesn't tell you that you're solving a problem that has to do with geocoding.

So respectfully, Your Honor, I would say that although counsel's right that geocoding is discussed in the specification, it's completely absent from any of the claims from 1 all the way down through the end.

**THE COURT:** Okay. Thank you.

**MS. PIEPMEIER:** Thank you, Your Honor.

**THE COURT:** Let's go to question 4, which is about the *Zillow* case that we've been discussing. In that case, the

Federal Circuit held that another computerized mapping patent failed Step Two on the pleadings because the alleged inventive concept was the application of an abstract idea using a general purpose computer. Why is that holding not applicable equally to the '318 patent, where the invention uses a conventional web browser and any type of competing device?

**MR. McMANIS:** Your Honor, Jason McManis again for the plaintiff.

So a two-part answer, the first part being a more general proposition that simply because an invention is used on a general purpose computer, that wouldn't negate inventiveness that otherwise exists. So that's kind of part one.

On *Zillow* specifically, if, if the claims of *Zillow* are closely examined, they relate specifically to a single device, a single use or their device. Think of maybe zooming in on your map and getting more detail, something like that. The problem for the patent owner in that case was if Your Honor thinks back to road atlases, when I was a kid we always traveled with a road atlas. And, you know, you're looking at the whole state, and then you turn the page over and you kinda zoom in on a particular city. That was the real problem for the patent owner in the *Zillow* cases. That really was describing something that already existed in paper form and putting it into a digital form. So that is -- and for a single user, like someone driving in their car. Hopefully not the

driver, but someone driving in their car.

Now, what we have that is -- well, two other points about the *Zillow* case. The crux of the holding really was that the claims and the specification were kind of divorced from the conclusory statements made in the complaint about the inventiveness. So you almost had a situation where the allegations of inventiveness were negated by the specification, and that was another issue that led to the holding there. And then the second was that there was really no guidance on how to put that into play on top of the fact that it was divorced from the specification and there was a clear analog.

So the difference that we have on the '318, as well as some of the other patents that are in the case, the '479, '810, '330 and '903, is the correction of information in those patents. It creates a one-to-many solution, not just a single person's solution.

So I agree that on my road atlas or by my maps go, I could cross out a location that's on the wrong side of the street and I could draw it in on the other side. What I cannot do is update the database of locations so that every other user who now tries to access that gets the correct information. And that's the key difference between *Zillow* and these patents, and it's that precise type of one-to-many solution -- that language actually comes from *Berkheimer*, the Federal Circuit case -- that takes claims in *Berkheimer*, specifically claims where a

single edit can update every document in the archive that's linked to that object structure -- that was the description of the claim in *Berkheimer*, very similar to what we're talking about here. And in *Berkheimer*, a summary judgment decision was actually overturned, saying that there are fact issues.

And so again, you know, I hate to be a broken record, but here we are at the pleading stage, and a fact issue is going to preclude dismissal at this stage of the case. And if, in *Berkheimer*, the fact that there is a one-to-many solution creates a fact issue at the summary judgment stage, I think certainly the fact that you have one-to-many solution at the pleading stage creates a fact issue. And if we get down the road after there's opportunity to take discovery on inventiveness and so forth, they want to make an argument that we haven't raised a genuine dispute of fact, well, that's a question for another day. But here today, those inferences are taken in our favor.

Now, specifically on the issue of geocoding. I wasn't -- I'm not really sure which version of the argument to respond to, whether none of the claims have geocoding or actually some of them do. There is geocoding in at least Claims 5 and 12, and the particular methods that are described are ways for a manager to make corrections that would actually implement an update to those geo coordinates.

Now, we're not arguing that the claims are inventive

because they have -- on the sole basis that they have a manager, and that's certainly not the argument that we're advancing here. And I think any patent claim that involves users making requests, or so forth, are always going to involve a person at some level. I don't think that negates inventiveness any more than the existence of general purpose computer elements.

But I do think when you have Claim 9, for example, of the '318 -- and there are a number of other examples in the other patents -- when you describe a particular way for a manager to make that correction, they see it on their map that exists in digital form and they either, you know, they circle the area that it's supposed to be in, maybe they drag an icon as we get to some of the other patents, that automatically updates the geo coordinates, that's a solution to the problem with geo coordinates. At the very least, there's a question as to whether or not that's an inventive solution, and that's really what we're here to decide today.

So I do think there's a, like I said, the one-to-many distinction is really critical here. It's critical under *Berkheimer*, and to the extent that we discuss some of the other patents today, I'll bring that up again. But it is also, again, a reason why simply looking at one claim from the '318 doesn't tell us about the rest of the elements contained in the four other patents, where you do have these particular

descriptions of moving an icon, drawing a circle. And they may not all be treated the same way, because that's a question for another day, for experts to talk about, well, this one might be inventive and this one might not be.

**THE COURT:** Thank you.

Let me give defendants an opportunity to respond, obviously without repeating what we already went through.

**MS. PIEPMEIER:** Thank you, Your Honor. Yes, I'll not repeat what we just went through.

I guess the first point I would make is that in the -- the one-to-many point itself can't solve this problem. I think in *Berkheimer* there was more how you do it, how you solve it. So it created technological advances in a one-to-many situation, but it told you how to do it. It told you how that was reducing inefficiencies. It told you how that was released. It created an issue of fact as to how that was improving the computer itself.

Here we have a classic example of using a computer, of a person sitting at a computer, typing something in, and the computer itself is making the one-to-many change. That is the hallmark of using a computer to solve a problem that already existed. We know the problem already existed of inaccurate, incomplete mapping. Your Honor has already talked about that today. And if the solution is just use a computer which allows a database to propagate that, I fail to see how that is

inventive in and of itself. We've been using computers to update databases remotely for I don't how long. The fact that it's done in the situation of mapping, as the specification talks about, really doesn't save that.

So I don't see how in this particular situation at all the one-to-many distinction solves anything. Again, if they told you how you do it, maybe that would be different.

Again, going back to Claims 5, 12 and 17 that use the words "geo coordinate," I mean, I just want to read Claim 5 as an example, because there's a suggestion made that maybe this solves a geocoding problem. I mean, the claim says: A method as recited in Claim 4 wherein geo coordinates are determined for the point of interest. I fail to see, respectfully, how that is a solution to a geocoding problem, and it certainly doesn't tell you how to do anything. It's a "wherein" statement. It's just a wherein there's a geo coordinate.

Now, going to Claim 9 which counsel mentioned -- and I'll just read that, since not everyone probably has the patent in front of them: The method as recited in Claim 1 further comprising receiving from the manager over the data network -- again, a human being doing that -- user input representing an outline of a physical element of a geographical map, and updating the geographical map at the database to include the physical element, that's just Claim 1 basically saying there's an icon or there's a box around a property. I don't see how

that's any different from what we've already been talking about. It's just showing you, it's just telling you there's a display that is associated with that that has a box around it. That doesn't provide anything inventive, and it certainly doesn't tell you how. It doesn't tell you how to solve the geocoding problems, and I think that is precisely the issue with Step Two here.

The bottom line is that the '318 patent could have been drafted in a way that specifically solved, had they solved that problem, were the inventors in possession to a solution to the geocoding problem, they could have solved that with drafting. They could have drafted claims that were closer to *X1*, or to *Bascom* or to some of the other cases they cited. Instead, they preempted this whole concept of updating information using a manager. And even if you -- the computer allows you to propagate that from one to many, that can't provide an inventive concept. There's certainly no allegation that one-to-many updating of a database is something inventive at the time of this patent.

**THE COURT:** Thank you.

I promised an opportunity for everyone to let me know one last thing that you want me to know before we conclude. So let me give plaintiff the first opportunity, and then it will be defendants. Plaintiffs can have the last word.

**MR. McMANIS:** With Your Honor's permission, can I let

Mr. Henry address representativeness briefly? And then I would like to make just a couple of points on the other patents with respect to Step Two.

**THE COURT:** That's fine.

**MR. HENRY:** Good morning, Your Honor. Ab Henry for Never-Search.

Your Honor, I'll be brief, but I just wanted to bring the Court's attention to the dispute between the parties on the representativeness of the claims that defendants have alleged are representative of the entire subset of dependent claims in all these patents. For Google, that would be four representative claims covering eight separate patents, and for Microsoft and Apple that would be one representative claim per patent.

Now, the Federal Circuit in *Mobile Acuity* -- that's the seminal case on this issue -- has said clearly that the burden to prove up a prima facie case of representativeness is on the defendants, not the plaintiffs. None of the defendants have met that burden. The reason that the burden is on the defendants is because courts have found time and time again that the burden to prove ineligibility of any patent claim, independent or dependent, remains with the defendant at all times.

Now, for defendants to claim that one claim is representative of four patents puts -- shifts that burden on us

at the initial briefing stage for us to respond and say, no, that claim's not representative of four separate patents. That's the first reason that this is improper.

Second, the standard is clear, as well, that they have to demonstrate that the group of claims are substantially similar and link to the same ineligible concepts, and they can't merely just state that standard and say that it does so as a conclusory statement and meet that burden. For example, in the Google brief, they simply acknowledge the standard for representativeness and notes that courts may require the parties to identify representative claims. Then they use that as a basis for their motion anyway. The Court in this case has not required the parties to do so, and in many cases the courts do require the parties to address representativeness in supplemental briefing, which has not happened in this case.

Also, we've talked about some examples today of how the dependent claims change the Step Two analysis. I'll just simply talk about one example. Google argues in Claim 9 of the '981 patent is representative, and they support that claim with a two-sentence conclusory footnote, Footnote 2, where they state that the Claim 9 of the '981 patent is representative of the dependent claims of the '981 (sic), a different patent, because they add no appreciable effects on the patent eligibility analysis, and yet there is no explanation, no analysis, nothing further to actually explain how these

additional limitations, how this entirely different patent doesn't change the '101 eligibility analysis.

There are two main issues with this. The first one is using claims from one patent as representative of claims in another patent is improper. Not only do they not meet their burden to address how that claim is representative of an entirely different patent, but the Federal Circuit has explicitly disfavored this practice.

So in *Novartis Pharmaceutical Corporation versus Breckenridge*, a 2018 Federal Circuit case, tells us that claims in one patent will not representative claims in another patent, because patent must contain distinct inventions. Obviously the Court goes on to say after that, that since the different patents must contain different -- patentably different distinct inventions, it follows that the claims in one patent will not usually represent all of the inventive concepts embodied in the claims of another patent. And this is all from *Novartis*.

Now here, not only did they use the representative claim without any kind of explanation within the same patent, they used it for a different patent and provided no analysis of why they were doing that in their opening briefs. Second, *Enfish*, another Federal Circuit case, teaches that a claim is not representative merely because it generally deals with the same subject matter. Now, clearly a patent is directed to a single invention typically, and a lot of the dependent claims will add

additional limitations to that invention. They are going to, at the high level of abstraction, relate to the same idea. Now, that does not automatically mean that any independent claim is representative of its dependents. And again, *Berkheimer* specifically teaches that courts should not treat a claim as representative simply because it is an independent claim. Yet that is what we see in the briefs, that they simply say an independent claim is stated, the dependent claims provide no different analysis of '101 without providing any explanation of how the analysis doesn't change.

So even though they, the defendants, haven't met their initial burden, we still have -- plaintiffs have pointed out multiple additional limitations not found in the representative claims that have distinctive significance, which is the standard, that would have an impact on an eligibility analysis.

So, Your Honor, you asked a lot of questions today on different problems that these patents address. You know, problems 2 and 3, incompleteness and inaccuracy in the data. Also problem 1 and 4, you know, UI, that sort of thing. And the Court has asked separate questions. It has a different analysis for each of those technological problems.

Now, some of the dependent claims that we've asserted in this case solve different tech' -- or solve different one of those problems than the representative claim. For example, in the Claim 1 of the '903 patent, it is not representative to

Claim 2 or Claim 9. Claim 1 is focused on solving problem number 1, switching between map programs and third-party websites.

So Claim 2 and Claim 9 solve a different issue. They solve -- or an additional issue. They change the '101 analysis by solving problem number 4, which is improving the UI by selecting points of interest while traveling and using small screens. And we have briefed this in our response, and we've listed out a lot of different dependent claims and how the analysis changes.

Now, what the defendants have done in reply to that is list additional bases for invalidity for those -- for the dependent claims, but that's not part of the representativeness analysis. What we're pointing out in our brief is that it is not the same analysis for the representative claim and the dependent claims. Now, they have full prerogative in their opening brief to discuss the reasons why each dependent claim is invalid if it's not fully represented by the representative claims, which they should have done, yet they did not do that. Instead, they only come in their reply brief to discuss additional bases, saying, well, it would still be invalid. Problem number 4 doesn't change the invalidity analysis, because it would still be invalid.

What does change the invalidity analysis, the Court obviously has full discretion to make an invalidity ruling on

each of the problems, but they are separate issues. So that the '101 analysis would be different, there meaning that the representativeness would fall apart at that stage.

And again, a lot of these examples are in our briefing, and we'll rest on those examples. But Mr. McManis has a couple of separate issues on the Step Two portion from claims in the other patents that he would like to discuss, as well, if that's okay with the Court.

**THE COURT:** Thank you.

**MR. McMANIS:** Thank you, Your Honor. Jason McManis again. I'll be brief.

I just want to address the four patents that we haven't really talked about. I mentioned them earlier, the '479, the '810, the '330 and the '903. And I heard a little bit of argument about preemption and the example from I think it was the '318, how that preempts the entire field. I think if we look at -- even if Your Honor were to accept that argument, and I disagree with that, but if we compare the claims of those other four patents to that, there are clear differences.

One example that I gave, moving the icon is an example that's used specifically in the '479. And what that moving the icon does, it actually updates geo coordinate data in the database. And the reason that's an improvement is because, as the specification describes, geo coordinates have typically been populated just by using address information that was

available. So this was specifically in those claims that involve -- and I use the example of an icon in the '479. There are other descriptions in the '810, '330 and '903. It does involve different ways to populate that geo coordinate data by accepting changes to information and doing so on a one-to-many basis. So it's not simply, well, my map will be correct and everyone else's will be wrong, or everyone else's will be wrong until they purchase the next year's software update, if they do. It's actually a one-to-many solution like *Berkheimer*.

And just on *Berkheimer* very briefly, the claims that were found to have fact issues were dependent claims that had not been analyzed because the independent had been analyzed, and the elements in these dependent claims included things like storing a reconciled object structure in the archive without substantial redundancy. Again, it's describing something that is being accomplished, but it is because it is taking place on that one-to-many basis it's satisfying Step Two at least as a fact issue. The holding was not actually that -- I don't want to mischaracterize *Berkheimer*. It didn't find that those claims were patent eligible, it just found that fact issues existed. And again, Claim 5, selectively editing single items in an object structure linked to other structures to effect that one-to-many change.

And so I think, Your Honor, as we're, again, coming off the discussion of representativeness and looking at a number of

these dependent claims and independent claims and the patents that haven't been discussed, there is a lot there that really accomplishes that one-to-many type of improvement that simply it's not addressed in any of the briefing. We, I don't think, have heard argument that one-to-many as a matter of law is not sufficient to create a factual dispute. And so I think under *Berkheimer*, looking at those patents that contain that type of one-to-many solution is certainly enough to get us past the pleading stage right now.

**THE COURT:** Thank you.

Let me give defendants an opportunity to respond.

**MR. ALMELING:** Thank you, Your Honor.

David Almeling for Google. I'm going to respond to the representativeness point, and to the extent any of my colleagues would like to address the other patents, they can do so.

So representativeness is not new in defendants' motion to dismiss. It was of course in the complaint, where the plaintiff selected one claim as being representative for each of the eight patents. As for deciding at the motion to dismiss stage whether the representativeness is satisfied, we agree with them that the *Mobile Acuity* case is the applicable case. It's a 2024 decision that identified the burden, and importantly, it identified the burden shifting that goes there. So it began by saying the burden goes to a moving party, the

defendants in this case, to show that the claims are substantially linked to the same abstract idea. That's what defendants did here. They showed that it was patents from -- claims from the same specification, it's a common specification across the patents, the various same ideas are reflected in all of the claims, and the various dependent claims only add non-patent-eligible information, things like do it on a small device or other conventional technologies, or they limit it to a certain technical area, which, again, is not patent eligible. So that is a satisfaction of the prima facie burden.

Then, importantly, *Mobile Acuity* talks about a burden shift, and here's what it says about the burden shift, and this is from page 1290: Quote, if the patent owner fails to meet its obligation to make a nonfrivolous argument in opposition to the representativeness claim contention, it forfeits its right to argue that the claims in the group identified by the movant are patent eligible even if the representative claim is ultimately found to be ineligible, end quote.

What happened here after we establish a prima facie burden that all of the claims that were done by the representative one, they did not address the vast majority of the claim. In fact, they only identified 14 as being nonrepresentative. We then addressed each of those 14 and explained, well, no, those are actually representative, and here's why, because they fall under the same abstract idea, and they only add non-patent-

eligible information. That satisfies our burden, and therefore this Court can, just like almost all courts who address these issues, find a representative claim.

I'll make one final point regarding the '903 patent as the one that they gave as illustrative of the failure to show representativeness, and they identified Claims 2, which is essentially take the representative claim, but do it on a small device, or Claim 9, which is take the representative claim, but do it as part of the same graphical user interface. Those are classical examples of nonadditive patent-eligible information, and therefore they fail for the same reasons that the representative claims fail.

**THE COURT:** Thank you.

**MR. DANFORD:** Your Honor, Andrew Danford again. I'll just make two very brief points with respect to the '479 and '810 patents. This is the one where the drag and drop feature was discussed.

If Your Honor looks at the patent specification, there's no unique technology, no technological improvement involved in those interactions with the user interface to drag and drop or double click to move. I believe that the patent specification even refers to the interactions as drag and drop and double click. So those are just the standard computer functionalities and ways to interact with a computer.

The specification, again, re-enforces this. If you look

at the '479 patent, Column 18, Lines 32 to 35, the same disclosure in the '810 patent at Column 18, Lines 20 to 23, the patent discloses that everything can be accomplished using commonly available map navigation controls. The same patent specification later in Column 28 states that the computing device may be any of any type. And in Column 9, the patent specification again says that everything can be accomplished using a conventional web browser.

So this is the type of using generic computer components to do the standard functions that is patent ineligible. It doesn't supply an inventive concept under Step Two.

**THE COURT:** Last word for plaintiff.

**MR. McMANIS:** Thank you, Your Honor.

So I do want to be clear. Our position on representativeness is not that we rebutted a prima facie case. It's that they never established it in the first place, and they never did anything, never did anything to address the additional limitations, like in some of those patents that I discussed a short while ago, in their briefing to actually make their prima facie case on those issues. They also, they do not address the one-to-many nature of these claims in any of their briefing or argument or how that -- how *Berkheimer* establishes that that creates a fact dispute.

And then the last thing I'll say just with respect to claims targeted towards small screens. In *Core Wireless*, the

Federal Circuit noted specifically that claims for improved interface, particularly on devices with small screens, was something that was an inventive aspect there in *Core Wireless*.

So with that, Your Honor, I think we will rest on the briefing.

**THE COURT:** Thank you all. The argument was very helpful, and I appreciate the quality of the briefing on all sides in this case, which was excellent. I will take the matter under submission and issue a written order.

Thank you. Be well.

(Proceedings concluded at 11:29 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Saturday, January 4, 2025

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court